Filed 9/19/13  P. v. Carvajal CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO CARVAJAL,<br><br>    Defendant and Appellant. | B239135<br><br>(Los Angeles County<br>Super. Ct. No. BA368069) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Alex Ricciardulli, Judge.  Affirmed as modified.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Francisco Carvajal (defendant) appeals his conviction of first degree murder. He contends that the evidence was insufficient to support a finding of premeditation and deliberation; and that the evidence was insufficient to support a theory that he aided and abetted the murder or the felonies underlying the prosecution's felony-murder theory. Defendant also contends that the trial court erred in failing to instruct the jury with CALCRIM No. 549, and that the court erroneously imposed a 10-year gang enhancement rather than a 15-year minimum parole eligibility requirement. We modify the sentence to strike the gang enhancement, but finding no merit to defendant's other contentions, we affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with the murder of Juan Ocegueda (Ocegueda),[1] in violation of Penal Code section 187, subdivision (a).[2] The information specially alleged pursuant to section 186.22, subdivision (b)(1)(C), that defendant committed the crime for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members; and that defendant personally used a deadly weapon, a knife, within the meaning of section 12022, subdivision (b)(1). The information further alleged that defendant had served a prior prison term as described in section 667.5, subdivision (b).

A jury found defendant guilty of first degree murder and found true the gang allegation, but found not true the deadly weapon allegation. On January 6, 2012, after the prosecutor chose not to proceed on the prior prison term allegation, the trial court sentenced defendant to 25 years to life in prison, plus an additional 10 years due to the

---

[1]     The victim's name is apparently misspelled in the information, as his sister, Elizabeth Ocegueda, testified that the spelling of her surname was Ocegueda. We therefore use her spelling for the victim, but refer to the victim's siblings Elizabeth and Julio Ocegueda by their first names to avoid confusion.

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

gang finding. Defendant was given 691[3] actual days of custody credit and the court ordered him to pay mandatory fines and fees as well as restitution in the amount of $3,844.41. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Ocegueda lived with his parents, sister Elizabeth and brother Julio. Elizabeth and her parents occupied the main house in front, and the brothers had rooms in the garage next to the back alley. Shortly before 8:45 a.m. on December 6, 2006, Elizabeth was leaving with her mother to bring Julio home from the hospital. Elizabeth testified she saw Ocegueda on the front porch with a man she knew as "Chance," identified by other witnesses as David Canche (Canche). As Elizabeth and her mother got into their car, Elizabeth saw Canche walk toward the back gate that led to the alley behind their house. At the gate, Canche spoke to another man, who appeared to be hiding. Elizabeth could not identify the other man as he stood almost completely behind the garage and she could barely see him. The unidentified man and Canche were both wearing dark clothing.

A short while later, two 911 calls were placed, one from a motorist after she nearly hit a bleeding man running across the street and another after Ocegueda knocked on his neighbor's door for help, before collapsing in front of her house. When Elizabeth returned home with her mother and brother just past 10:00 a.m., the police were there. Elizabeth saw the lock on her bedroom door had been broken and the living room was in disarray as though there had been a struggle.

Deputy Medical Examiner Vladimir Levicky testified that Ocegueda suffered four stab wounds: one five to six inches deep that penetrated his chest, right lung, and right heart ventricle, and caused death within several minutes; one life-threatening stab wound to the abdomen that was almost as deep as the first; and two superficial wounds. Dr. Levicky testified the wounds were probably caused by a knife, and assuming a four-inch blade, pressure would have been required to inflict the two deeper wounds. In his opinion, the fatal stab wound to the chest was the first to be inflicted, based on the

---

**3**     The abstract of judgment shows the total credits as 690.

3

minimal bleeding of the abdominal stab wound. Ocegueda also had a cut on his finger and a long cut running from his forehead through his eyebrow and down his cheek.

Monique Flores (Flores) testified that Canche was her boyfriend in December 2006, and that Ocegueda was a close friend, so close that she thought of him as her brother. Ocegueda occasionally allowed Flores and Canche to stay with him in his room and the three sometimes used drugs together. Flores was also acquainted with defendant during that time. Defendant was not acquainted with Ocegueda.

Canche and defendant were members of the Highland Park gang;[4] Flores denied being a member of the gang during the time she dated Canche, but admitted that she associated with the gang. She also admitted she had committed two robberies, one with Canche, and had been convicted of receiving stolen property, car theft or joy-riding, petty theft, and possession of a firearm by a felon. She testified under an immunity agreement.

Flores was with Canche and defendant nearly all of the night before the murder. Defendant and a friend had waved them down in the street while she was driving a car she and Canche had stolen. Canche told Flores to stop for defendant and she complied, although she did not want to do so because defendant had lost the respect of the Highland Park gang about two months earlier. Flores explained that defendant would have to earn back the gang's respect by committing crimes such as robbery, assault, or even a killing. She also knew that defendant needed money because he had been living on the streets. Canche told her that he (Canche) would do anything for money, which Flores expected from any gang member; she explained that gang members stole because many of them used drugs or needed money "or because someone did somebody wrong or stuff like that."

While driving around, the group stopped briefly at Ocegueda's house to ask after Julio, who had been beaten in a robbery at his house during which Flores's laptop and Elizabeth's printer had been stolen. Later, after dropping her passengers off at various places, Flores went to work until 5:00 a.m. Thereafter she stopped at Ocegueda's house

---

**4** Chance was Canche's gang "moniker" or nickname. Defendant's gang moniker was "Cisco" or the "Cisco Kid."

to have him check something on her stolen car before picking up Canche and defendant at Canche's mother's residence. Flores then drove to a parking lot where she and Canche smoked methamphetamine with a friend while defendant slept in the back seat. After that Flores drove Canche and defendant back to Ocegueda's house where she parked in the alley near Ocegueda's room. While Canche went to speak to Ocegueda, Flores occupied herself by "fixing" the ignition of a car parked nearby. Flores testified that as far as she knew, defendant continued to sleep in the back seat of the car.

After what seemed to Flores like 15 minutes, Canche and defendant appeared in the alley near her car telling her to "Hurry up, get in the car" and, "We have to go." Defendant was wearing Flores's two-tone windbreaker that was dark on the bottom with dark sleeves. Canche wore a black windbreaker that resembled a bomber jacket. Flores saw blood on their jackets and hands. Defendant was holding a large antique-looking knife, about five inches long, with a mother-of-pearl handle, which he placed in the pocket of the passenger door. The two men were nervous, acting paranoid and overly rushed. Flores screamed, "What the fuck did you do?" and tried to throw the keys, but they insisted that she drive. She argued with them, asked what they had done, demanded to go back, and repeatedly tried to get out of the car. At first, Flores claimed that neither man would tell her what had happened; later in her testimony, she admitted that both Canche and defendant told her they were inside the front house where Ocegueda was stabbed. Defendant told Flores that Ocegueda had tried to fight back while saying, "No, no, please, no."

Flores testified she drove them to Canche's house, where she again attempted to escape. Canche caught her, dragged her back to the car, placed her in the back seat, and drove to East Los Angeles to a house belonging to a man Flores did not know. Canche gave the man their jackets and defendant told him to burn them. The man put the jackets in a black trash bag and went toward the back yard. Flores said she did not speak to the man and Canche held her hand or wrist during the time she was in his house. Then for

several hours she remained in the car which was locked with the alarm set while Canche and defendant stood at a distance talking.[5]

Defendant drove the car back to the carport of the apartment building where Canche's mother lived, and defendant guarded Flores there until 7:00 p.m. During that time, Flores received a call from a friend who said that Ocegueda was dead; Canche took the cell phone from Flores and terminated the call. Flores testified she hit Canche and told him she hated him as he put her back into the car.

Flores heard defendant say he wanted to go change his shoes because there was blood on them. Defendant drove the car to the home of a Highland Park gang member Jeremy Holell (Holell) also known as "Lucky." Flores fell asleep. She was awakened by police officers, who arrested her, searched the car, and seized a rifle from the center console. Canche was also arrested, but defendant was not found. At some point before she and Canche were arrested, Canche and defendant both cried, and Canche told Flores he was sorry.

Flores was interviewed by Homicide Detective Jose Carrillo of the Los Angeles Police Department (LAPD). She lied to him at first, not wanting to be a "snitch" and wanting to protect her boyfriend, but she finally told the truth because she cared more about Ocegueda. Flores knew the gang might "green light" her for snitching, meaning that gang members would kill her. She told Detective Carrillo that Canche went into Ocegueda's house to get his own belongings, but she knew that defendant went inside to take Ocegueda's new laptop computer which was kept in the front house.

Detective Carrillo testified that Flores directed him to Osorio's house after her arrest. Osorio said that defendant had asked him to burn the black bag he had left in the trash. Detective Carrillo retrieved the bag from the trash and inside found a two-tone

---

[5] The owner of the house in East Los Angeles, Arthur Osorio (Osorio), testified that defendant, his cousin, came to his home that morning with a woman to rest for awhile. Osorio also claimed that the woman chatted with him and said she had met him years ago when she came to a party at his house. The next day, police came and found a black bag in the back yard.

Adidas jacket which Flores identified as the one defendant had been wearing. Detective Carrillo found a black down-filled jacket in the clothes dryer. The two jackets were later examined. Samples from both jackets tested positive for blood and Ocegueda's DNA. Defendant's DNA was found on the Adidas jacket which defendant had worn.

At the time that Flores and Canche were taken into custody defendant had disappeared. Detective Carrillo searched for him for several years in Los Angeles, Victorville, and Compton. Defendant's family members reported he had fled to Mexico and had been killed there, but that was unable to be confirmed. Finally, in February 2010, Los Angeles County sheriff's deputies arrested defendant after they saw him break a car window. Defendant gave his name as Mysael Lara and a false date of birth, but his fingerprints identified him as defendant.

**Gang evidence**

LAPD Detective Steven Aguilar was called as the prosecution's gang expert regarding the Highland Park gang and two other gangs in northeast Los Angeles. Detective Aguilar investigated these gangs by patrolling the area, talking to gang members and documenting the information gained, assisting in probation and parole checks, and investigating gang crimes. Detective Aguilar testified that Highland Park was a large gang with common symbols, hand signs, and graffiti. He described Highland Park as a violent gang and its primary criminal activities as vandalism, tagging, assault, robbery, and sometimes murder, and presented certified records of two murder convictions entered after he had participated in the investigations.[6] Detective Aguilar testified that he was acquainted with both defendant and Canche and when he stopped defendant in November 2006, defendant admitted he was a member of the Highland Park gang. In Detective Aguilar's opinion, Canche was also a Highland Park gang member.

---

[6] One of the murders was committed in April 2006 by Jesse Rodriguez, a younger member of the Highland Park gang who killed a fellow gang member's girlfriend after seeing her with a rival. The other murder was committed in January 2006 by Felix Rene Ramirez, also a Highland Park gang member.

7

Given hypothetical facts mirroring the evidence presented at trial, Detective Aguilar stated his opinion that the crime was committed for the benefit of the Highland Park criminal street gang. He explained that such a crime committed in Highland Park territory during broad daylight by two gang members would help the gang control the neighborhood by strengthening the gang's violent reputation and instilling fear in the residents of the community, making them less likely to call the police. Murder was the ultimate act of violence committed to inhibit people from cooperating with the police, thus facilitating the commission of other crimes.

Detective Aguilar defined the phrase "putting in work" for the gang as committing a crime for the gang. At least two gang members usually participated in such a crime so that one could be a witness and give the perpetrator credit within the gang so that he might gain respect. If a gang member refused to support a fellow gang member while committing a crime, or if he attempted to prevent it, he would lose the gang's respect and could be disciplined, even killed.

Detective Aguilar was acquainted with Holell, or Lucky, a documented member of the Highland Park gang. As an older member who had committed many crimes for the gang and had served time in prison, Holell was well respected within his gang. Referring to the hypothetical facts given by the prosecutor, Detective Aguilar testified that going to the home of a respected fellow gang member was further evidence that the crime was committed for the benefit of the gang. Gang members liked to show off and brag about their crimes and would often go to another gang member's house afterward for that purpose.

**Defense evidence**

Canche testified on defendant's behalf, taking all the blame for Ocegueda's death but denied he had ever intended to steal from or rob Ocegueda. Canche claimed he could not recall whether defendant was present at the time, but later in his testimony he said he

8

was alone with Ocegueda. Canche testified he was in prison at the time of trial as a result of a plea to charges related to Ocegueda's death.[7]

Canche testified he was on friendly terms with Ocegueda in 2006 and went to his home often, approximately 40 or 50 times in November 2006. Canche and Flores had been living together but were evicted in 2006 and still had no stable home in December. Ocegueda lived in a detached converted garage, and he never went into the front house during their visits. Ocegueda's parents did not want him or any of his friends there as they disapproved of "his chosen lifestyle." Canche had never gone to the front house before December 6, 2006.

Defendant and Canche knew each other from the Highland Park neighborhood where Canche grew up and they had been friends for several years. When Canche and Flores were driving around on the evening of December 5, 2006, they "met up" with defendant and "hanged out for a minute" before picking up Flores's girlfriend. Canche could not remember what they did the rest of the night but they went to Ocegueda's house in the morning. Flores parked in the alley and defendant slept in the back seat. Ocegueda told Canche that he would meet him in the back in a few minutes, after his mother and sister left. Canche denied seeing defendant or any other man in the alley while Ocegueda was chatting with his mother and sister.

Canche claimed he followed Ocegueda to the front house after Ocegueda refused to help him gather his belongings in the garage room. Canche testified that once in the front house, he confronted Ocegueda with rumors that he had raped someone, and Ocegueda became hysterical and they argued. Ocegueda repeatedly said Canche's name and pleaded with him not to do anything to him. Canche claimed this behavior confused him because he was not being aggressive or threatening and did not have a weapon at that time. The argument became more heated until they exchanged blows and Canche took

---

[7]     The jury was not informed that Canche entered into a plea bargain under which he was permitted to plead no contest to voluntary manslaughter and serve 13 years in prison.

his knife from his pocket and stabbed Ocegueda. Asked to describe the knife, Canche testified that it was all silver or chrome in color.

Canche could not recall most of the events that followed. He remembered returning to the car but not whether defendant was in the car or outside at the time. He remembered going to his mother's place, but nowhere else. Canche did not recall going to East Los Angeles, spending several hours at Osorio's house or leaving his jacket there. Canche claimed Flores was upset only at first, and that he did not hold her against her will. He recalled going to Holell's house because they needed a place to spend the night and Holell was a friend. He could not remember where defendant went after that.

Canche admitted gesturing to defendant when he entered the courtroom, but denied it was a greeting. He admitted that he was member of the Highland Park gang but when asked whether defendant was a member of the gang, he refused to answer. He also refused to say whether Holell was a gang member. Canche admitted he knew that Ocegueda had computers and a laptop, and although he initially denied knowing whether he possessed drugs, he conceded that Ocegueda might have had drugs at sometime during their visits.

When Canche was interviewed by Detective Carrillo after his arrest he denied stabbing Ocegueda, participating in it, or knowing who did, adding, "and I'm not going to name no names." He also told detectives there was someone else with him but he did not know who. When the detective said, "you know who did because you were right there," Canche answered, "But I'm not going to tell you who did it."

Defendant's wife, Leticia Carvajal, testified she had lived with defendant since 2004 and they married in 2009. She said that defendant had worked the entire time, either as a tow truck driver or a security guard. She brought his pay stubs, one for January 2006, another for July 2006, and one each from 2005, 2008, and 2010. She claimed they never lived apart since their marriage, although he did leave for a few days in December 2006 after an argument. He returned home before Christmas. She never heard family members claim defendant died in Mexico, did not know that defendant was a gang member, and knew nothing of this incident until his arrest in February 2010.

10

# DISCUSSION

## I. Substantial evidence

Defendant contends that his conviction of first degree murder was not supported by substantial evidence. In particular, he contends that the evidence of premeditation and deliberation was insufficient, that the evidence of aiding and abetting was insufficient to impose vicarious liability for Canche's crime, and that the evidence of an intent to rob or commit a burglary was insufficient for felony-murder liability.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) The appropriate test is not whether the evidence proves guilt beyond a reasonable doubt, but whether the evidence supports the jury's conclusions. (*People v. Wright* (1985) 39 Cal.3d 576, 592.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### A. *Premeditation and deliberation*

"All murder which is perpetrated by means of . . . willful, deliberate, and premeditated killing . . . is murder of the first degree." (§ 189.) Premeditation and deliberation means "preexisting reflection and weighing of considerations rather than

11

mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the California Supreme Court suggested "three types of evidence -- evidence of planning activity, preexisting motive, and manner of killing -- that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) There is no requirement that all three factors be established or that any one factor must be accorded a particular weight. (*Perez, supra*, pp. 1124-1125.)

First defendant cites Flores's testimony that as far as she knew, defendant was asleep in the back seat of the car when Canche went inside to speak to Ocegueda, apparently suggesting that he could not have planned the crime because he was asleep. If so, defendant fails to view the evidence in the light most favorable to the jury's express and implied findings, as we must. (See *People v. Redmond* (1969) 71 Cal.2d 745, 755.) Flores also testified the very next time she saw defendant after seeing him asleep, he was outside the car acting rushed, nervous, and paranoid, holding a knife, with blood on his hands and jacket -- blood later determined to contain Ocegueda's DNA. The jury could reasonably infer that Flores was either complicit, trying to avoid snitching on defendant, or she had not been paying attention while she was "fixing" the ignition of a car parked in the alley. In any event, Flores also testified that both defendant and Canche told her they had gone inside Ocegueda's house. Defendant even reported to her that Ocegueda had tried to fight back while saying, "No, no, please, no."

In addition, Elizabeth testified she saw Canche speaking to a man in dark clothing who appeared to be hiding behind the garage. The jury was not required to reject this observation in favor of Canche's denial that he saw a man in the alley at that time. It is the province of the jury to believe or disbelieve testimony, resolve conflicts in the testimony, and draw factual inferences. (*People v. Alexander* (2010) 49 Cal.4th 846, 883.) The jury could reasonably infer that the man behind the garage was defendant, as defendant wore a dark jacket, had been nearby, asleep in a car, and there was no evidence of a third man in the alley.

Defendant also contends there was no substantial evidence of planning because the decision to go to Ocegueda's house was spontaneous, thus not part of a preexisting plan to steal or kill.[8] Defendant's argument presupposes that planning is probative only if it takes place prior to arriving at the scene of the crime. There is no requirement however, that planning activity take place at a particular time prior to the decision to kill. "'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.) Elizabeth testified that Canche spoke to the man in the alley while he appeared to be hiding. As defendant's demeanor was furtive and the crime was committed soon after Elizabeth and her mother left, the jury could reasonably infer that Canche's conversation with defendant involved planning the crime -- if they had not done so before their "spontaneous" arrival on the scene.

Further, planning may be reasonably inferred from evidence that defendant armed himself before committing the crime. (See, e.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1050; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224.) Substantial evidence supports a finding that either defendant or Canche or both were armed with knives at the time: Canche testified he carried a silver or chrome colored knife in his pocket when he followed Ocegueda into the front house, and Flores testified that defendant had with him a knife with a mother-of-pearl handle as he entered the car immediately after the stabbing.

Again disregarding the evidence favoring the jury's findings, defendant suggests that the only evidence of motive was defendant's gang membership and his need for money. A review of all the evidence reveals facts from which a jury could reasonably infer that both defendant and Canche harbored a motive not only to gain money, but also to gain respect within defendant's gang, or at least not to lose respect. Flores testified

---

[8]    Defendant's characterization of the decision as spontaneous is apparently drawn from Flores's testimony that she "just decided" to go to Ocegueda's house at 7:40 that morning.

that defendant needed money because he had been living on the street. Canche told her that he would do anything for money, and she admitted that she and Canche had committed a robbery together. Flores's experience with the gang taught her that gang members stole money when it was needed. As part of her association with the Highland Park gang, Flores had committed two robberies, auto theft, and had received stolen property. Flores and Canche knew that Ocegueda owned a brand new laptop computer that he kept in the front house, and which Canche had told Flores that defendant wanted.

In addition, defendant was a member of the Highland Park gang, a violent gang whose primary criminal activities included robbery, assault, and murder. Flores testified that defendant was "not wanted" by the gang. Based upon her experience with the gang, Flores explained defendant would have to prove himself in order to be invited back into the gang by earning respect. Earning respect and proving oneself meant committing crimes such as robbery, assault, even murder. Gang expert Detective Aguilar also testified that committing such crimes was considered putting in work for the gang, and the member who did so earned respect from his gang.

Both Canche and defendant admitted to Flores they were present when one of them stabbed Ocegueda. Detective Aguilar explained that in gang culture, crimes committed to earn respect were generally committed with another gang member present in order to have a witness. If the fellow gang member refused to provide support, he in turn would lose the gang's respect and could be disciplined, even killed. Following the murder, defendant and Canche went to the home of an older, well respected member of their gang, a common practice when a gang member wishes to have his crime acknowledged.

Consideration of the evidence also erodes defendant's claim that the decision to go to Ocegueda's house was spontaneous: Flores "just decided" to go there with her criminal gang associates knowing they needed money, that Ocegueda owned a brand new computer, and that defendant was under pressure to prove himself to the gang. Flores may not have meant for her associates to kill Ocegueda, but the evidence certainly suggests that she assisted in planning a robbery or theft.

14

As to the manner of killing, "[a] violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation. [Citation.]" (*People v. Pride* (1992) 3 Cal.4th 195, 247.) Defendant attempts to counter this logic by arguing that a brutal stabbing is insufficient *in itself* to support a finding of premeditation and deliberation. He illustrates his point with the facts of *Anderson*, in which the defendant, with no apparent motive, indiscriminately inflicted 60 superficial and severe cuts all over a child's body. (See *Anderson*, *supra*, 70 Cal.2d at pp. 21-22.) As the *Anderson* facts bear no similarity to the facts of this case, defendant's attempt fails. First, the brutal stabbing in this case, unlike the crime in *Anderson*, was accompanied by evidence of motive and planning. Second, Ocegueda was stabbed in the chest with enough force to cause the knife to penetrate his heart and lung, killing him within minutes. As our high court made clear in *Anderson*, "directly plunging a lethal weapon into the chest evidences a deliberate intention to kill as opposed to the type of 'indiscriminate' multiple attack of both severe and superficial wounds" inflicted in that case. (*Id*. at p. 27.)

As there was evidence of planning, motive and a gruesome manner of death, the three *Anderson* factors, we conclude that substantial evidence supported a finding that defendant either premeditated and deliberated his murder of Ocegueda or shared Canche's premeditated and deliberated intent to kill Ocegueda.

### B. Aiding and abetting

Defendant contends the evidence was insufficient to support his liability as an aider and abettor.

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Defendant again contends that the evidence showed he was asleep in the car in the alley when Canche acted alone and murdered Ocegueda. In addition, defendant again

15

suggests the only evidence that he was awake and out of the car was Elizabeth's testimony, which should be rejected because the man she saw behind the garage could have been someone associated with one of the other cars parked in the alley. Defendant also argues that Canche's "uncontroverted testimony . . . shows he acted alone in stabbing Juan Ocegueda" and that "[t]here is no evidence whatsoever from which to infer that [defendant] formed the specific intent to aid and abet the fatal stabbing by Canche."

As we have previously observed, the jury was not required to discount or disbelieve Elizabeth's observation, or to believe Canche's testimony. Nor was the jury required to speculate that Canche was speaking to an unidentified stranger in the alley, as it was the province of the jury to believe or disbelieve testimony, resolve conflicts in the testimony, and draw factual inferences. (*People v. Alexander*, *supra*, 49 Cal.4th at p. 883.)[9]

We have also previously found substantial evidence from which the jury could reasonably conclude that defendant was present when Ocegueda was murdered: defendant admitted to Flores that he was inside the house; that Ocegueda had tried to fight back; and that Ocegueda said, "No, no, please, no." Further, Flores saw defendant outside the car immediately after the murder. Defendant was not only awake, he was rushed, nervous, and paranoid, held a knife, and had Ocegueda's blood on his jacket.

Defendant points to the rule that *mere* presence at the scene is insufficient to establish aiding and abetting liability. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 407.) Even so, presence "'is a circumstance which will tend to support a finding that an accused was a principal. [Citations.]' [Citation.]" (*Ibid*.) Other factors relevant to the determination include companionship and conduct before or after the offense,

---

[9]     Quoting *People v. Acevedo* (2003) 105 Cal.App.4th 195, 198, defendant suggests that the jury was not permitted to infer that he was the man in the alley because "'[w]hen the facts give equal support to two competing inferences, neither is established.'" That case was referring to speculative inferences, not logical inferences based upon substantial evidence. (See *People v. Massie* (2006) 142 Cal.App.4th 365, 369.) When inferences are equally reasonable, the fact that the evidence can be reconciled with a contrary finding does not require reversal. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

16

including flight. (*People v. Medina* (2009) 46 Cal.4th 913, 924.) Evidence of all such factors was presented here. Defendant was not *merely* present. He was seen immediately after the killing with a knife and the victim's blood on him. Further, he and Canche were members of the same gang and went to the murder scene together. We have previously concluded that the evidence was sufficient to give rise to a reasonable inference that both defendant and Canche harbored motives to rob and kill Ocegueda and that they planned the crime together. After the murder the two men fled together, knowing that one or both of them had stabbed Ocegueda. Thus evidence of the relevant factors of presence, companionship, and conduct before or after the offense amply support the conclusion that defendant was either a direct perpetrator or he intentionally promoted, encouraged, or instigated the commission of the crime with knowledge of Canche's unlawful purpose. (See *People v. Beeman*, *supra*, 35 Cal.3d at p. 561.)

### C. Felony murder

Defendant contends that the evidence was insufficient to support a murder conviction under a felony-murder theory.[10] "All murder . . . which is committed in the perpetration of, or [an] attempt to perpetrate, . . . robbery [or] burglary . . . is murder of the first degree." (§189.) A person who enters a house, room, or building with the intent to commit a theft or any felony is guilty of burglary. (§ 459.)

Defendant contends that the evidence was insufficient to support the prosecutor's argument in summation that defendant needed money for drugs, and he points out that the prosecutor failed to argue that he took or attempted to take any specific property. We review the record for substantial evidence to support the *judgment*. (*People v. Johnson, supra*, 26 Cal.3d at p. 578.) Defendant does not claim prosecutorial misconduct and cites no authority that would require a review of the evidence supporting the prosecutor's argument.

---

**10** Though defendant argued that the evidence was insufficient to support a finding of intent to kill or reckless disregard for human life, as required for a sentence of death or life without parole (see § 190.2, subd. (c)), since that special circumstance was not alleged or found true and defendant was not sentenced under that provision, he has withdrawn this contention.

Regardless, the evidence discussed in relation to defendant's other contentions more than adequately supports a finding that defendant entered the front house with the intent to steal. Canche testified he never before had gone into the front house during his visits to Ocegueda whose parents did not want him or any of his friends there. Canche had never gone to the front house before December 6, 2006. Nevertheless, he went inside the front house with defendant, a stranger to Ocegueda, after Flores "just decided" to go to Ocegueda's house with her criminal gang associates knowing that they needed money, that Ocegueda kept his brand new computer in the front house, and that defendant was under pressure to prove himself to the gang. We find otherwise.

## II. CALCRIM No. 549

Defendant contends the trial court erred in failing to define "one continuous transaction" by not instructing the jury sua sponte with CALCRIM No. 549.

The felony-murder rule provides that a killing is first degree murder if "committed in the perpetration" of certain enumerated felonies, including burglary and robbery, as alleged here. (§ 189.) "[C]onviction of first degree felony murder does not require proof of a strict causal relationship between the underlying felony and the homicide so long as the killing and the felony are part of one continuous transaction. [Citations.] 'There is no requirement that the killing occur, "while committing" or "while engaged in" the felony, or that the killing be "a part of" the felony, other than that the few acts be a part of one continuous transaction.' [Citation.]" (*People v. Huynh* (2012) 212 Cal.App.4th 285, 307-308, fn. omitted.)

The felony-murder rule requires some logical connection or nexus between the felony and the act resulting in death beyond mere coincidence of time and place. (*People v. Cavitt* (2004) 33 Cal.4th 187, 201 (*Cavitt*).) CALCRIM No. 549 lists factors to assist in the determination of whether the act causing the death and the felony were part of one continuous transaction under the felony-murder rule. The suggested factors include whether the felony and fatal act occurred at the same place, the time interval if any, whether the perpetrator continued to have control over the victim after the underlying felony was committed, whether the killing occurred during flight, and whether death was

18

directly caused by the underlying felony or its natural and probable consequences. (See CALCRIM No. 549.) A trial court has no sua sponte duty to give such an instruction "if the requisite nexus between the felony and the homicidal act is not at issue and the trial court has otherwise adequately explained the general principles of law requiring a determination whether the killing was committed in the perpetration of the felony . . . ." (*Cavitt*, *supra*, at p. 204.)

This jury was adequately instructed when the trial court read CALCRIM Nos. 540A and 540B, regarding the elements of felony murder committed by a direct perpetrator and an aider and abettor. The court's reading of CALCRIM No. 540A included the following language: "The defendant must have intended to commit the felonies of burglary or attempted robbery before or at the time that he caused the death. It is not required that the person die immediately, as long as the death and the felonies are part of one continuous transaction." CALCRIM No. 540B cites five factors to consider in determining whether the prosecution had met its burden to prove guilt under the felony-murder rule, concluding with the following: "There was a logical connection between the cause of death and the burglary or attempted robbery. The connection between the cause of death and the burglary or attempted robbery must involve more than just their occurrence at the same time and place."

Although defendant's reasoning is unclear, we understand his contention to be that since the evidence was insufficient to prove that defendant entered the house with the intent to steal or rob, an issue was raised as to whether the burglary or attempted robbery and the killing were part of one continuous transaction. Pointing to Canche's testimony that he went to the front house merely to visit and that he stabbed Ocegueda spontaneously after their argument escalated, defendant suggests that the jury could have found the killing was "unrelated to the commission of any subsequent burglary and/or attempted robbery except for the mere coincidence of time and place." Such facts, if believed, would establish that defendant was neither the direct perpetrator nor an aider and abettor. In other words, if defendant had no intent to steal or rob and did not participate in or encourage what was an impulsive stabbing by Canche, he was not guilty

19

of murder, and there would be no transaction to characterize as continuous or not continuous and no need to clarify the meaning of one continuous transaction.

As respondent notes, assuming there was sufficient evidence that defendant did intend to commit a burglary or attempted robbery, no evidence suggested that the killing was unrelated to that burglary or attempted robbery or that the two crimes were anything but "one continuous transaction." As the felonies and the fatal stabbing took place in the same place very soon after defendant and Canche entered the front house, there was no need for the jury to consider such factors suggested in CALCRIM No. 549 as to whether there was a time interval; whether the killing took place during flight, or whether the perpetrator continued to have control over the victim after the felonies were complete. Defendant's factual argument thus does not demonstrate any need to clarify the meaning of "one continuous transaction" such as by reading CALCRIM No. 549, and the trial court was under no sua sponte obligation to give the instruction. (See *Cavitt, supra*, 33 Cal.4th at p. 204.)

Defendant's argument that he was prejudiced is in essence a claim that the omission of CALCRIM No. 549 caused him prejudice because if the evidence to prove his intent to commit the underlying felonies and the murder had been insufficient, the instruction might have caused the jury to concluded that the requisite nexus had not been proven. As defendant was convicted based on overwhelming evidence of his guilt, not the trial court's failure to read a wholly inapplicable instruction, we conclude beyond a reasonable doubt that the omission of CALCRIM No. 549 from the jury's instruction did not contribute to the verdict.

## III. Gang enhancement

Defendant contends the gang enhancement imposed under section 186.22, subdivision (b)(1)(C), should be stricken and replaced by a minimum 15-year parole eligibility term. Respondent agrees. Because the jury convicted defendant of first degree murder, an offense that carries a sentence of 25 years to life in prison, defendant's gang enhancement is governed by the 15-year minimum parole eligibility term of section 186.22, subdivision (b)(5). (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007-1008.) We

thus modify the judgment accordingly, but note that the modification does not shorten the 25 years to life term.  (§ 190, subds. (a) & (e); *People v. Lopez*, *supra*, at p. 1009.)

## DISPOSITION

The judgment is modified by striking the gang enhancement imposed under section 186.22, subdivision (b)(1)(C), and imposing a 15-year minimum parole eligibility term pursuant to section 186.22, subdivision (b)(5).  The judgment is affirmed in all other respects.  The trial court is directed to forward a corrected copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS


_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


21